**REDWING CARRIERS, INC., Plaintiff,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Defendants,**

and

**McKenzie Tank Lines, Inc., Intervenor.**

No. 65–420–Civ–T.

United States District Court
M. D. Florida,
Tampa Division.

Aug. 15, 1967.

Hill, Hill & Dickenson, Tampa, Fla., McInnis, Wilson, Munson & Woods, Washington, D. C., for plaintiff.

Schwartz, Proctor & Bolinger, Jacksonville, Fla., Ike K. Hay, Asst. Gen. Counsel, Interstate Commerce Commission, Washington, D. C., Edward F. Boardman, U. S. Atty., Tampa, Fla., Nicholas deB. Katzenbach, Atty. Gen. of U. S., Washington, D. C., for defendants.

Dan R. Schwartz, Jacksonville, Fla., for intervenor defendant.

Before JONES, Circuit Judge, and LIEB and YOUNG, District Judges.

## OPINION

GEORGE C. YOUNG, District Judge:

Plaintiff, Redwing Carriers, Inc., (Redwing), seeks judicial review of an order of the Interstate Commerce Commission granting a certificate of public convenience and necessity to McKenzie Tank Lines, Inc. (McKenzie), to operate in interstate or foreign commerce as a common carrier by motor vehicle, over irregular routes, of phosphate, phosphate products and phosphate by-products in bulk, in tank or hopper vehicles, from points in Polk County, Fla., to points in Hillsborough County, Fla., restricted to shipments having a subsequent for-hire movement by water. The Commission's order affirmed and adopted the findings and recommendations of a joint board. Redwing, Seaboard Air Line Railroad Company (Seaboard) and Atlantic Coast Line Railroad Company (ACL) protested.

■ The transportation involved here is in interstate or foreign commerce because the authorized movements are limited to those having subsequent movement by water to points in another state or country. State Corporation Commission v. Bartlett & Co., 338 F.2d 495 (10th Cir. 1964), certiorari denied 380 U.S. 964, 85 S.Ct. 1109, 14 L.Ed.2d 154 (1965).

Redwing was the only motor carrier authorized to transport phosphate and phosphate products from Polk County to Hillsborough County, Florida, although the two rail carrier protestants, Seaboard and ACL, also had such authority. Previously, the vast bulk of both dry and liquid phosphate products destined to move through the port of Tampa (in Hillsborough County) Florida, has been transported by rail from the mines or processing plants in Polk County to the Tampa port where the railroad cars unloaded directly into the vessel.

An expected substantial increase in the movement of phosphate and phosphate products between the points herein involved was testified to by various sup-

porting witnesses. The joint board found:

"There will soon be considerable increase in traffic from producing points to the port. W. R. Grace and Company expects increase of approximately 4,000 truckloads or 100,000 tons per year; Coastal Chemical Corporation expects an increase of 25,000 to 50,000 tons per year and will have from 8,000 to 10,000 truckloads per year available; Customer's Cooperative Assn. will have a minimum of 50,000 tons of phosphoric acid and 100,000 tons of dry commodities annually which will be all new traffic; American Agricultural Chemical Co. will have an increase of approximately 2,000,000 tons per year of which 20% to 25% were moved by motor carrier; Monsanto Company will receive in excess of 75,000 tons of phosphoric acid per year which will be greater than 3,000 truckloads and will be new traffic; Swift & Company expects an increase of approximately 550,000 tons per year."

■ The finding of anticipated increased traffic was amply supported by substantial evidence and documented by the joint board. The board then proceeded to a conclusion as to the need for service resulting from increased traffic. It said:

"The need for service which will arise must be anticipated and such action as will assure an adequate and sufficient facility to meet that need must be taken. The shippers presently are experiencing delays which have become increasingly more frequent in the past year. Clearly, the public will not be served by waiting until the transportation situation becomes critical before authorizing additional service. With the large scale increase in production as is anticipated, the demands for transportation service of the specialized nature here considered will greatly exceed the capacity of existing facilities."

■ Plaintiff, however, contends there was no testimony about the amount of traffic that motor carriers would have or that such testimony was speculative, so that the finding of increased traffic is irrelevant to the certification of an additional motor carrier. However, there was somewhat definite testimony in this regard. Supporting shipper, W. R. Grace, testified that 5% of its total tonnage might be hauled by motor carrier (about 4,000 truckloads a year); American Agricultural Chemical Co. estimated 15% to 20% of its increased production would go by truck from Polk County to the Tampa port; and Monsanto Chemical Company estimated it would route 3,000 truckloads per year of phosphoric acid from Polk County to Tampa. Other shippers estimated substantial truck traffic without specific figures. Because predictions lack the certainty of hindsight some speculation is unavoidable. The weight of such evidence is within the province of the Commission. As was said by Mr. Justice Douglas in United States v. Detroit and Cleveland Navigation Company, 326 U.S. 236, 66 S.Ct. 75, 90 L.Ed. 38 (1945):

"* * * Forecasts as to the future are necessary to the decision. But neither uncertainties as to the future nor the inability or failure of existing carriers to show the sufficiency of their plans to meet future traffic demands need paralyze the Commission into inaction. *It may be that the public interest requires that future shipping needs be assured rather than left uncertain. The Commission has the discretion so to decide."* (Emphasis added.)

Despite Redwing's contention to the contrary, the board did conclude that the existing service was inadequate for it found:

"Existing carriers are not presently equipped to handle this increased traffic. While they are prepared and expect to acquire additional equipment to be in a position to render better services, the evidence is convincing that there will be an unprecedented need

for transportation facilities in this area. Even with the protestants' added facilities the joint board is impressed that there will be a need for the applicant's proposed service.

The supporting shippers are currently confined to rail and one motor carrier and feel, generally, that sizeable ventures of the nature engaged in require that there be another motor carrier to insure an uninterrupted service. In view of the volume of traffic and the tremendous expansion taking place, there is reasonable justification to the shippers' request for the services of more than one motor carrier. There are no indications that traffic will be diverted and it is apparent that the grant of authority sought herein would not deprive the protestants of any traffic they now enjoy and there will be no material adverse effect on operations of opposing carriers. Motor carriers are not now participating in the traffic and diversion, if any, from rail carriers will be slight, particularly in view of the increased production, and the public should not be deprived of a new and improved service because it may divert some traffic from other carriers. The introduction of a competitive service is in the public interest where it will secure the benefits of an improved service without being unduly prejudicial to the existing services. * * * "

■ The record here indicates that there was substantial evidence from which the Commission could conclude that an additional motor carrier was needed. A large increase in phosphate traffic was anticipated, a substantial part of which would be hauled by motor carrier. This was especially true if shippers and consignees could have the assurance of the services of at least two motor carriers before making long term commitments for storage facilities, the completion of which was in turn dependent upon those commitments. All supporting shippers and consignees testified that multiple carrier service was necessary because of the seasonal nature of the demand for certain phosphate products and because of the need for uninterrupted service. Several shippers and consignees testified that they had prior adverse experience in single motor carrier operations elsewhere, and that multiple carrier service was customary in the industry.

This case is governed by the decisions of this Court in Petroleum Carrier Corporation v. United States, 258 F.Supp. 611 (D.C., 1966) and Petroleum Carrier Corporation v. United States, 258 F.Supp. 617 (D.C., 1966). The findings of the Commission were supported by substantial evidence and its conclusions were in accord with applicable law. The Commission's order should be approved and the complaint dismissed; appropriate judgment will be entered.