**ALTERMAN TRANSPORT LINES, INC., et al., Plaintiffs,**

v.

**UNITED STATES of America, and the Interstate Commerce Commission, Defendants.**

**Civ. No. 72-68.**

United States District Court,
M. D. Florida,
Orlando Division.

July 20, 1973.

Gregory A. Presnell and Thomas C. Garwood, Jr., of Akerman, Senterfitt, Eidson & Wharton, Orlando, Fla., for plaintiffs.

L. Agnew Myers, Jr., Washington, D. C., Raymond M. Zimmet, I.C.C., Washington, D. C., John H. D. Wigger, Dept. of Justice, Washington, D. C., Whitaker & Koepke & Asso., Orlando, Fla., for Fla.-Texas Freight and Armellini Exp. Lines Inc.

Wilmer B. Hill, of Ames, Hill & Ames, Washington, D. C., for Armellini Exp. Lines Inc., for defendants.

Before DYER, Circuit Judge, and YOUNG and HODGES, District Judges.

DYER, Circuit Judge:

We are asked by the plaintiffs, pursuant to 28 U.S.C.A. §§ 1336, 1398, 2284 and 2321–2325, to set aside a decision of the Interstate Commerce Commission granting a motor carrier certificate to Armellini Express Lines, issued on October 19, 1971, (operations having been theretofore conducted under temporary authority served November 7, 1967, MC–105636 Sub 27TA) to handle freight forwarder traffic moving from the northeastern section of the United States to Florida destinations.[1] Armellini Express Lines, Inc., Extension— Freight Forwarder Traffic, 113 M.C.C. 603 (1971). We decline to do so and dismiss the complaint.

Armellini's application was supported by Florida-Texas, Inc., a freight forwarder. The latter assembled and con-

---

1. From Boston, Massachusetts; New Haven, Connecticut; New York, New York; Carlstadt, New Jersey; Jersey City, New Jersey; and Philadelphia, Pennsylvania; to Jacksonville, Orlando, Tampa, Ft. Pierce, West Palm Beach, Fort Lauderdale, and Miami, Florida.

solidated shipments and provided break-bulk and delivery services for the shipping public. As a forwarder it specialized in the transportation of small shipments and, under its own name and responsibility, provided through transportation service from point of origin to destination, but was prohibited from performing the actual line haul movement of the shipments it accepted for transportation. Plaintiffs and Armellini are common carriers by motor who perform the underlying line-haul transportation. Florida-Texas had been primarily using rail carriers to transport its traffic, but due to equipment shortages and delivery delays by the railroads it found that the rail service was unsatisfactory. On the other hand, during the time Florida-Texas used Armellini's service, under the temporary motor authority granted to the carrier, Armellini's service had been superior to any other Florida-Texas had previously received. The plaintiffs opposed the application, but no rail carrier took such action.

After the initial hearing, the examiner by order served May 6, 1968, recommended that the application be granted, excepting, however, service from Boston, New York City, and Jersey City. The examiner, we think, properly summarized the case as follows:

> Since Florida-Texas presently has available, by rail, rates which meet its requirements, but it does not find that rail service is satisfactory for all of its traffic, it desires to have available for its use motor carrier service. No service can be used by Florida-Texas unless a rate is available to it below the rate charged to its customers. Such a rate is available by rail but is not shown to be available by motor, therefore, as a practical matter, the existing motor carrier service is not available to Florida-Texas. The question presented is whether the lack of available suitable rates is a service deficiency warranting a grant of additional authority, or whether there is here merely a question of the level of

the rates which is not a proper matter for consideration in a motor common carrier application proceeding, unless the level is such as to constitute an embargo. . . .

The examiner concluded that without "freight-all-kinds" (FAK) rates, the traffic could not move by motor carrier no matter what the level of the "less-than-truckload" (LTL) rates that would have to be used might be, and consequently that the forwarder's requirement for a particular type rate was a service requirement and not a level of rate requirement. The examiner thus decided that the plaintiffs did not have suitable rates available to the freight forwarder which would permit it to move its traffic and that they were therefore not providing a necessary service with the result that there was a demonstrated public need for Armellini's service. The examiner concluded that:

> To find otherwise would leave the forwarder at the mercy of its competitors, insofar as motor service is required, and thus effectively prevent it from expanding and being a competitive factor in the transportation scheme.

Subsequently, a majority of Review Board No. 2, holding that it could not determine from the record whether plaintiffs' rates constituted an embargo against the freight forwarder's traffic, denied Armellini's motor application on the ground that it had failed to carry its burden to establish that fact.

In September 1969, three members of the Commission, acting as an Appellate Division, *sua sponte* ordered that the proceeding be reopened for further hearings, limited to evidence concerning the issue of whether plaintiffs' rates would preclude their use by the freight forwarder.

In August 1970, a different examiner, at the further hearing, found that the level of plaintiffs' rates and the absence of suitable type forwarder rates were rate problems for which a more appropriate corrective procedure was available

under the Act. Alternatively, the examiner suggested that Florida-Texas could apply for a premium rate and thus bear the plaintiffs' existing rates. Review Board No. 2 again, by a split decision, affirmed the examiner's recommendation, holding, in effect, that the matter was a rate question and not a service problem and thus was not a proper matter for consideration unless the level of rates was shown to constitute an embargo. Finding that there was no embargo, the Board concluded that the application should be denied.

On June 4, 1971, Appellate Division 1 reopened the matter and on reconsideration granted the application in its entirety. The Commission concluded that the freight forwarder was dependent upon other carriers to move its traffic and, absent their offer to do so at adequate rates to the forwarder to move its traffic profitably, the existence of freight forwarders could be jeopardized. Further, the Commission found that the plaintiff's rates were too high and "structurally ill suited" to move freight forwarder traffic. Moreover, it found that the plaintiffs had not attempted to negotiate lower rates but had taken an adamant position that Florida-Texas should increase its rates. The Commission also determined that the plaintiffs would not be adversely affected by its decision because they had demonstrated a willingness to forego the traffic. Finally, it concluded that plaintiffs' existing rates effectually precluded Florida-Texas from using their services and under these circumstances the failure to hold out their services to the freight forwarder constituted an embargo of its traffic.

The plaintiffs attack the Commission's findings of fact as insufficient to resolve the embargo issue and attack its conclusion that their traffic involved would not be subject to diversion. Finally, they urge upon us that the Commission's conclusion that plaintiffs had embargoed the freight forwarder's traffic is not supported by competent, substantial evidence upon the record as a whole. We are unimpressed with all of these contentions.

 We start with the well established premise that the Commission has broad discretion under 49 U.S.C.A. § 307(a) in determining whether the public convenience and necessity warrants certification of a proposed carrier service. ICC v. Parker, 1945, 326 U.S. 60, 65 S.Ct. 1490, 89 L.Ed. 2051; Florida Terminals and Trucking Co. v. United States, M.D.Fla.1972, 363 F.Supp. 1355; Redwing Carriers, Inc. v. United States, M.D.Fla.1967, 271 F.Supp. 685; Petroleum Carrier Corp. v. United States, M.D. Fla.1966, 258 F.Supp. 611; R–C Motor Lines, Inc. v. United States, M.D.Fla. 1965, 241 F.Supp. 124. We must then determine whether the findings and order of the Commission are arbitrary, capricious, or unsupported by substantial evidence. Consolo v. FMC, 1966, 383 U. S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131; ICC v. Louisville & Nashville R. R., 1913, 227 U.S. 88, 33 S.Ct. 185, 57 L.Ed. 431; Accelerated Transport-Pony Express, Inc. v. United States, D.C.Vt.1964, 227 F.Supp. 815, affirmed per curiam, 379 U.S. 4, 85 S.Ct. 43, 13 L.Ed.2d 21.

 The plaintiffs somewhat obliquely argue that because the support for Armellini's motor application came from a freight forwarder who is "another regulated carrier," this is a case of first impression. We disagree. In *Florida Terminals, supra,* the support for a grant of a motor carrier certificate to a carrier authorizing it to handle freight forwarder traffic came from regulated forwarders. Surely they must be allowed to testify in support of applications for motor authority since motor carriage is one form of transportation that they must depend upon to move the freight of individual shippers tendered to them. *See, e. g.,* Central Forwarding Inc., Ext.—Household Goods, 107 M.C.C. 706, 714 (1968), modified on other grounds, 110 M.C.C. 29; Dobbert Common Carrier Application, 73 M.C.C. 711 (1957).

Turning to plaintiffs' argument that the Commission's findings of fact are insufficient to resolve the embargo issue, the Commission found that the plaintiffs provided only token solicitation for freight forwarder traffic; plaintiffs' rates were too high and structurally ill suited to move the freight forwarder's traffic; and that plaintiffs did not attempt to negotiate lower rates but were willing to forego this traffic. Plaintiffs counter that they were "reserved and cautious" in making any rate concessions because they were in competition with Florida-Texas. Furthermore, they assert that Florida-Texas should have adjusted its own rate structure upward. Finally, they contend that they could not offer FAK rates because such rates might have been deemed to be discriminatory.

We are not moved by plaintiffs' "reserved and cautious" argument. On the contrary, it seems obvious that their real purpose was to stifle competition by denying any motor service to the freight forwarder who was admittedly regarded as plaintiffs' competitor.

Nor are we impressed with the plaintiffs' position that it might be feasible for the freight forwarder to increase its rates to the shipping public to obtain the added benefits of motor carrier line-haul transportation. Underlying this argument is the plaintiffs' complaint that they were denied the opportunity of showing that Florida-Texas' rates were depressed and were lower than corresponding rates of competing freight forwarders. It is axiomatic that shippers are not required to raise their own rates so that they can afford existing carriers' excessive rates. In any event, it is undisputed that no plaintiff has offered FAK rates to any forwarder within the scope of the application in issue. Obviously the rates of Florida-Texas are on file with the Commission and were not shown to be unreasonable or unlawful. They are not in issue here. Plaintiffs have adequate administrative remedies under the Act to question whether Florida-Texas' rates are too low, 49 U.S.C.A.

§§ 1006(a)–(b), (d), and whether Armellini's rates to freight forwarders are too low. 49 U.S.C.A. § 316(e). Finally, absent a tender of proof by plaintiffs of a comparison of rates of the freight forwarders, we refuse to indulge in speculative assumptions and arguments.

■ Plaintiffs' failure to offer FAK rates because of their expressed fear that they might be discriminatory gives us little pause. There has never been a suggestion that the plaintiffs should publish FAK rates applicable to Florida-Texas only. If the publication of such rates were open to all forwarders they could not be discriminatory. Armellini is, of course, obliged under its certificate to hold out its motor service to all freight forwarders, and its FAK rates can be used by any shipper. In any event, a carriers' service can be required by the public convenience and necessity even though only one or two shippers support the carriers' application for a license. Florida East Coast Ry. v. United States, M.D.Fla.1965, 242 F. Supp. 490, aff'd. per curiam, 382 U.S. 161, 86 S.Ct. 316, 15 L.Ed.2d 228.

Finally, we find it difficult to follow plaintiffs' argument concerning discriminatory rates when the plaintiffs themselves established FAK rates on April 30, 1971, albeit four years after Armellini's initial filing and after it was evident that the Commission was going to grant Armellini's application. In our view, the record establishes that the plaintiffs made every effort to block Armellini's application although they were not willing to provide the necessary motor service for the freight forwarder. Their belated filing is, we think, simply a token gesture designed to show that they were not embargoing the traffic.

■■ Plaintiffs take issue with the Commission's findings that they would not be adversely affected by a grant of the application since Florida-Texas had not used their services in the past and because the proposed operation is restricted to a service to be performed by freight forwarders. The record sup-

ports such a finding. Plaintiffs' unsubstantiated fears of diversion of traffic because the freight forwarders, by offering reduced rates, may be able to solicit LTL traffic from shippers who now utilize plaintiffs' services is unpersuasive. Assuming, however, that some diversion will take place, the plaintiffs are not entitled to protection from a competing carrier when the plaintiffs' service fails to meet a public need; and, equally important, the public should not be deprived of a new and improved service because it may divert some traffic from the plaintiffs. Schaffer Transportation Co. v. United States, 1957, 355 U.S. 83, 78 S.Ct. 173, 2 L.Ed.2d 117.

■ We are neither required to nor will we close our eyes to the fact that Armellini was granted emergency authority, followed by temporary authority to provide the service in question. Such authority has been in effect for approximately five years and Armellini has provided satisfactory service. In light of · the plaintiffs' foot dragging and relatively recent and very limited FAK rate schedule, the Commission cannot be faulted for granting Armellini's application. As the Court said in United States v. Dixie Highway Express, Inc., 1967, 389 U.S. 409, 411, 88 S.Ct. 539, 19 L.Ed.2d 639:

> It is, of course, true that the Commission should consider the public interest in maintaining the health and stability of existing carriers, see United States v. Drum, 368 U.S. 370, 374, 82 S.Ct. 408, 410, 7 L.Ed.2d 360 (1962); but it is also true that, upon the basis of appropriate findings, "the Commission may authorize the certificate even though the existing carriers might arrange to furnish successfully the projected service."

See also Carolina Freight Carriers Corp. v. United States, D.C.N.C.1971, 323 F. Supp. 1290.

■ Plaintiffs' last contention is that the Commission's conclusion that plaintiffs had embargoed the traffic in question is not supported by competent, substantial evidence. As previously noted, we disagree. The record clearly establishes that the plaintiffs never have been anxious or even willing to provide the necessary motor service in place of Armellini. Rather their desire has been to deny any motor service to Florida-Texas because they regard Florida-Texas, not Armellini, to be their primary competitor.

The plaintiffs did not, until recently, offer FAK rates. They had insisted that the freight forwarded bear plaintiffs' existing rates. While Florida-Texas could move its traffic profitably on Armellini's rate, but less profitably than on rail rates, it would have been forced to take a loss if it used the plaintiffs' truckers rates, no matter what type they were. We find that there was substantial evidence to support the Commission's decision that plaintiffs' rates were too high to move the forwarder's traffic. Furthermore, we are of the view that the Commission properly found special circumstances to be present in the case *sub judice* because the existing carriers' rates were so high that they constituted an embargo. This is so because the plaintiffs' rates and other circumstances clearly demonstrate that plaintiffs'ᵤ aim was to forego the traffic as well as to deny it to Armellini. *See, e. g.,* American Trucking Ass'ns, Inc. v. Atchison, Topeka & Santa Fe Ry., 1967, 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847; Porter Transp. Co. Ext.—Fertilizer, 91 M. C.C. 178 (1962); Ewell Ext.—Philadelphia, 72 M.C.C. 645 (1957); United Parcel Service, Common Carrier Application, 68 M.C.C. 199 (1956); H. L. & F. McBride Ext.—Ohio, 62 M.C.C. 779 (1954); *see also* ICC v. J–T Transport Co., 1961, 368 U.S. 81, 82 S.Ct. 204, 7 L.Ed.2d 147.

■ While we agree with the plaintiffs that *Ewell, McBride* and *Porter,* relied on by the Commission, can be distinguished on their facts, they do establish the principle, applicable here, that rates can be a significant factor in a motor certification proceeding when there are special circumstances present. To

recapitulate, there is substantial evidence to support the findings of the Commission that freight forwarders are as dependent as an unregulated shipper upon the level of rates established; while the plaintiffs have belatedly published FAK type rates, there has been only token solicitation for their services under rates which are too high and structurally unsuited for the freight forwarder's traffic; and the plaintiffs have demonstrated a willingness to forego the traffic in question. The conclusion drawn by the Commission that the plaintiffs' purpose was to create an embargo of the freight forwarder's traffic was correct. Carl Subler Trucking, Inc., Ext.—Southern States, 13 F.Carr.Cas. ¶ 34,440 (1958), and Worster Motor Lines, Inc., Ext.—Vegetable Oils, 1968 F.Carr.Cas. ¶ 36,195, relied on by the plaintiffs are not to the contrary. In *Subler* the supporting shippers were simply unhappy with the rates of the existing motor carriers whose services had not been tried because the shippers wanted rates at less than the effective rates of existing carriers. "Desire of the shippers for still lower rates, in the absence of a showing that existing service itself is inadequate, is no real justification for a grant of the proposed authority." In *Worster*, unlike this case, the protestant was moving *a substantial volume of traffic for other shippers* at a higher rate than proposed by the applicant *and solicited the traffic* of the supporting shipper.

█ We conclude that the findings and conclusions of the Commission and the grant to Armellini of new operating rights are supported by substantial evidence in the record as a whole, have a rational basis in fact, and are founded upon a proper application of the law. Accordingly, the complaint is dismissed and judgment entered for the defendant.[2]

2. Since plaintiffs made no objection before the Commission that Armellini should not, in any event, have been authorized to operate from Boston, New York City, or Jersey City, we decline to consider their argument on this point. United States v. Tucker Truck Lines, Inc., 1952, 344 U.S. 33, 73 S.Ct. 67, 97 L.Ed. 54.