559 F.2d 798
 182 U.S.App.D.C. 177
 REGULAR COMMON CARRIER CONFERENCE OF AMERICAN TRUCKING
ASSOCIATIONS, INC., Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
Kroblin Refrigerated Xpress, Inc. and Schanno
Transportation, Inc., Intervenors.
 No. 76-1452.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 21, 1977.
Decided June 2, 1977.
Certiorari Denied Oct. 17, 1977.
See 98 S.Ct. 299.
 
 Homer S. Carpenter, Arlington, Va., with whom R. Edwin Brady and Richard R. Sigmon, Washington, D. C., were on the brief, for petitioner.
 Walter H. Walker, III, Atty., I. C. C., Washington, D. C., with whom Robert S. Burk, Acting Gen. Counsel, Charles H. White, Jr., Associate Gen. Counsel, I. C. C., and Lloyd John Osborn, Atty., Dept. of Justice, Washington, D. C., were on the brief, for respondents.
 Anthony C. Vance, Washington, D. C., for intervenor, Schanno Transp., Inc.
 Thomas R. Kingsley, Washington, D. C., was on the brief for intervenor, Kroblin Refrigerated Xpress, Inc.
 Before McGOWAN, MacKINNON and ROBB, Circuit Judges.
 Opinion for the court filed by MacKINNON, Circuit Judge.
 MacKINNON, Circuit Judge:
 
 
 1
 In April of 1973, Kroblin Refrigerated Xpress, Inc. of Waterloo, Iowa, and Schanno Transportation, Inc. of West St. Paul, Minnesota, petitioned the ICC for certificates of public convenience and necessity for carriage over "irregular routes of general commodities, with the usual exceptions . . . (1) from Boston, Mass., Newark, N.J., New York, N.Y., and Philadelphia, Pa., to Kansas City, Mo., Dallas and Houston, Tex., and New Orleans, La.; and (2) from Springfield, Mass., to Kansas City, Mo., and Dallas and Houston, Tex. . . ." (J.A. 8). The petitions alleged that there was an inadequacy of service between those locations as provided by currently licensed carriers and by the railroads. The principal inadequacy was felt by freight forwarders, who supported the two long-haul carriers' applications.
 
 
 2
 Freight forwarders operate as common-carriers, and hold themselves out to the public as able to provide long-haul service. In actuality, however, their function is limited to collecting small shipments and consolidating them into what were called car-load lots in railroad parlance, applicable now to the trucking industry.
 
 
 3
 The administrative law judge found that the freight forwarders' concern was an inadequate basis for finding that the required convenience and necessity existed for granting the applicant carriers the operating certificates requested. The ICC reversed that decision on October 30, 1975, and granted both applications. 123 M.C.C. 831 (1975). Competing long-haul carriers have taken this appeal.
 
 
 4
 The ICC premised its decision on the ground that the need of freight forwarders to obtain long-haul rates low enough to allow the forwarders a reasonable profit was a proper consideration in determining public convenience and necessity. The Commission relied on its decision in Armellini Express Lines, Inc. Extension Freight Forwarder Traffic, 113 M.C.C. 603 (1971), aff'd sub nom., Alterman Transport Lines, Inc. v. United States, 361 F.Supp. 664 (M.D.Fla.1973) (three-judge court). That decision held that freight forwarders could support an application for a motor carrier certificate by long-haul shippers. If the rate structure by existing carriers was so unsuitable that the freight forwarder could not obtain a return on investment sufficient to stay in business, that was held to constitute adequate proof of the necessity to authorize carriers who were willing to provide such service at lower rates and that the public convenience would be served by granting such operating authority. The problem involves a combination of service and suitable rates. In Armellini, and in the present case, the freight forwarders sought a special type of rate, the "freight-all-kinds" or "FAK" rate. The existing motor carriers were willing to offer some of the service needed at higher rates set by type of commodity; but the freight forwarders were interested in avoiding the cost of separating out types of goods being shipped (with some exceptions) and desired a lower FAK rate. Kroblin and Schanno were willing to offer the suitable rates that the forwarders considered they needed whereas protestants were not.
 
 
 5
 The challenge brought against this rationale is based on the difference between freight forwarders, shippers, and common carriers. The Commission held, "suffice it to say that freight forwarders are recognized as common carriers by the act." 123 M.C.C. at 839. Petitioners emphasize that whereas common carriers must demonstrate a "public convenience and necessity" for their service, 49 U.S.C. § 307(a),[1] freight forwarders need only show that their service is "consistent with the public interest," 49 U.S.C. § 1010(c),[2] and with the national transportation policy declared in the act.[3] Nor, in petitioners' view, are freight forwarders equivalent to underlying shippers; their service is simply to consolidate and schedule long-haul shipments provided by other persons.
 
 
 6
 Although petitioners' disparagement of the service provided by freight forwarders in the post-rail transportation world has some validity, the fact remains that many shippers choose to deal with freight forwarders rather than to deal directly with long-haul carriers. The promptness and dependability of service offered by the freight forwarders evidently afford advantages of significant value, as judged by the marketplace. The case before us does not involve hypothetical freight forwarders attempting to prove, as a theoretic matter, the usefulness of their service. Rather, the freight forwarders concerned here are already established, and their persistent clientele testifies to the underlying public convenience and necessity in the forwarders' continued service. To override the Commission's decision holding that this service is consistent with the public interest, convenience and necessity in the light of such market experience would certainly go far beyond this Court's duty to inspect for substantial evidence, and might even trespass on an area committed to the agency's discretion. 5 U.S.C. §§ 701(a)(2), 706(2)(E) (1970).
 
 
 7
 However, we do not have to decide whether freight forwarders' support (when their services are being widely used at competitive rates) will alone suffice to uphold a carrier's application for certificate authority, because in this case the Commission paid careful attention to the inadequacy of service currently available to shippers over the routes applied for. The Commission also found, with substantial evidence, that "the protestants (petitioners here) have refused to make any meaningful effort to negotiate suitable FAK rates with the supporting forwarders and have, thereby, demonstrated their lack of interest in the involved traffic." (123 M.C.C. at 842; J.A. 12). The pattern of conduct by the protesting carriers is again quite similar to that found in Armellini. Cf. 361 F.Supp. at 669. And even if there were no actual intent to boycott, technical deficiencies in the existing carriers' authority prevent them from providing the service to freight forwarders proposed by Kroblin and Schanno:
 
 
 8
 Rail TOFC (trailer-on-flat-car) service has been demonstrated to be slow and erratic, and we disagree with the Administrative Law Judge that transit times of 5 to 11 days are adequate . . .. Joint-line motor carrier service is likewise slow and erratic, and it is significant that no rail carrier and only three motor common carriers oppose the application. As to the protestants, (a) none services New Orleans, (b) none has solicited or handled any of the supporting forwarders traffic, and (c) none indicated except in the most general terms, the nature, frequency, and quality of service it would provide.
 
 
 9
 (123 M.C.C. at 843; J.A. 13).
 
 
 10
 There being substantial evidence in support of the findings of fact of the Interstate Commerce Commission (123 M.C.C. 831), based on the entire record, Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951), and this court agreeing with the conclusions of law stated by the three-judge court in Alterman Transport Lines, Inc. v. United States, supra, concerning the position of freight forwarders in the national transportation scheme,[4] the Commission's decision is in all respects affirmed.
 
 
 11
 So ordered.
 
 
 
 [1]
 Subject to section 310 of this title, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operations covered by the application, if it is found that the applicant is fit, willing, and able properly to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, to the extent to be authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied: Provided, however, That no such certificate shall be issued to any common carrier of passengers by motor vehicle for operations over other than a regular route or routes, and between fixed termini, except as such carriers may be authorized to engage in special or charter operations
 49 U.S.C. § 307(a) (1970).
 
 
 [2]
 The Commission shall issue a permit to any qualified applicant therefor, authorizing the whole or any part of the service covered by the application, if the Commission finds that the applicant is ready, able, and willing properly to perform the service proposed, and that the proposed service, to the extent authorized by the permit, is or will be consistent with the public interest and the national transportation policy declared in this Act; otherwise such application shall be denied. No such permit shall be issued to any common carrier subject to chapters 1, 8, or 12 of this title; but no application made under this section by a corporation controlled by, or under common control with, a common carrier subject to chapters 1, 8, or 12 of this title, shall be denied because of the relationship between such corporation and such common carrier
 49 U.S.C. § 1010(c) (1970).
 3"NATIONAL TRANSPORTATION
 POLICY
 "It is hereby declared to be the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation subject to the provisions of this Act, so administered as to recognize and preserve the inherent advantages of each; to promote safe, adequate, economical, and efficient service and foster sound economic conditions in transportation and among the several carriers; to encourage the establishment and maintenance of reasonable charges for transportation services, without unjust discriminations, undue preferences or advantages, or unfair or destructive competitive practices; to cooperate with the several States and the duly authorized officials thereof; and to encourage fair wages and equitable working conditions; all to the end of developing, coordinating, and preserving a national transportation system by water, highway, and rail, as well as other means, adequate to meet the needs of the commerce of the United States, of the Postal Service, and of the national defense. All of the provisions of this Act shall be administered and enforced with a view to carrying out the above declaration of policy."
 Act of Sept. 18, 1940, ch. 722, tit. I, § 1, 54 Stat. 899.
 
 
 [4]
 Surely (freight forwarders) . . . must be allowed to testify in support of applications for motor authority since motor carriage is one form of transportation that they must depend upon to move the freight of individual shippers tendered to them. See, e. g., Central Forwarding Inc., Ext. Household Goods, 107 M.C.C. 706, 714 (1968), modified on other grounds, 110 M.C.C. 20; Dobbert Common Carrier Application, 73 M.C.C. 711 (1957)
 
 
 [361]
 F.Supp. at 667