BRINK'S, INC., Petitioner,

v.

UNITED STATES and Interstate Commerce Commission, Respondents,

Wells Fargo Armored Service Corporation, Intervenor.

No. 78–1876.

United States Court of Appeals, District of Columbia Circuit.

Argued June 20, 1979.
Decided Dec. 12, 1979.

---

Chandler L. van Orman, Washington, D. C., with whom Wheeler & Wheeler, Washington, D. C., were on the brief, for petitioner.

Gerald B. Fleming, Atty., I.C.C., Washington, D. C., with whom Mark L. Evans, Gen. Counsel, Henri F. Rush, Associate Gen. Counsel, I.C.C., John H. Shenefield, Asst. Atty. Gen., John J. Powers, III, Asst. Chief Appellate Section, and Catherine G. O'Sullivan, Atty., Antitrust Div., Dept. of Justice, Washington, D. C., were on the brief, for respondents.

Harry J. Jordan, David E. Wells, and Macdonald & McInerney, Washington, D. C., were on the brief for intervenor, Wells Fargo Armored Service Corporation.

Before ROBINSON and MacKINNON, Circuit Judges, and DAVIS,* Judge, United States Court of Claims.

Opinion for the Court filed by Judge DA-VIS.

DAVIS, Judge:

This case, like those decided today in *International Detective Service, Inc., et al. v. Interstate Commerce Commission*, 198 U.S. App.D.C. ——, 613 F.2d 1067 *(International Detective (Wells Fargo))*, involves a challenge to an Interstate Commerce Commission order granting contract carrier authority to a company in the armored car market. As in *International Detective (Wells Fargo)*, the Commission's order provides for new entry and competition in certain Federal Reserve Bank routes, routes previously dominated by one authorized carrier. However this order was a grant of temporary authority, under the terms of a different statutory provision,[1] which provides the sole basis of this petitioner's challenge. Because of the particular issues turning on a grant of temporary authority we consider this case separately. We conclude that the Commission did have discretion to approve a temporary grant in these circumstances, and we affirm the order.

I

BACKGROUND

As pointed out in *International Detective (Wells Fargo), supra,* the armored car industry is a specialized field dominated by four large firms with the Federal Reserve Banks providing the largest single source of demand. In the fall of 1977 Wells Fargo Armored Service Corporation applied for temporary authority to carry coin, currency and other high-value commodities on routes for the Federal Reserve Bank of Richmond, Virginia. The proposed routes covered shipments between Richmond and points in Virginia, West Virginia and North Carolina. In its application Wells Fargo included the usual evidence of ability and fitness, particularly its experience as an intrastate carrier of such commodities. Although Wells Fargo was the low bidder on these routes it could not actually receive the Reserve Bank's new three-year contract (starting in January 1978) unless it had Commission authorization. Wells Fargo had filed for permanent authority as a contract carrier, but it anticipated some years delay in administrative processing of this permanent application due to the opposition of the existing carrier, petitioner Brink's Incorporated. Wells Fargo wanted temporary authority to qualify for the Reserve Bank contracts in the interim period.

The Richmond Federal Reserve Bank filed a statement supporting the Wells Fargo application for temporary authority. The Bank, like those in *International Detective (Wells Fargo), supra,* had the responsibility of providing transportation of coin and currency to various member and non-member banks in the Southeast. Brink's was the only authorized carrier for the West Virginia and North Carolina routes, enjoying a monopoly of the Bank's business. In 1976 the Bank had requested competitive bids for armored car service on various routes. Wells Fargo was the lowest bidder on the West Virginia and North Carolina runs and another carrier, Federal Armored Express, captured other routes. Brink's did

* Sitting by designation pursuant to 28 U.S.C. § 293(a) (1976).

1. Section 210a of the 1935 Motor Carrier Act, now recodified, *see* 49 U.S.C.A. § 10928 (1979), provides:

§ 10928. Temporary authority for motor and water carriers

Without regard to subchapter II of chapter 103 of this title and subchapter II of chapter 5 of title 5, the Interstate Commerce Commission may grant a motor carrier or water carrier temporary authority *to provide transportation to a place or in an area having, respectively, no motor carrier or water carrier capable of meeting the immediate needs of the place or area.* Unless suspended or revoked, the Commission may grant the temporary authority for not more than 180 days. A grant of temporary authority does not establish a presumption that permanent authority to provide transportation will be granted under this subchapter. [emphasis added]

*Cf.* 49 U.S.C.A. § 10923 (1979) (standards for permanent authority as a contract carrier).

not submit the lowest bid for any territory. The Bank would save some $900,000 over three years if Wells Fargo had the contracts on the West Virginia routes.[2] On the basis of this very substantial cost savings and secondary advantages in Wells Fargo's service,[3] the Bank supported the application.

At first the Commission denied the application, and Wells Fargo sought review in this court, No. 78–1135. Prior to judicial consideration the Commission reopened the administrative proceeding,[4] and in an order of August 8, 1978, the full Commission, by a closely divided vote, approved the temporary authority grant. Tersely, the Commission found an "immediate and urgent [*sic*] need," based on the need to "give the supporting shipper an alternative choice in the competitive bidding for contracts   .   .   . Applicant needs this grant of authority in order to tender a bid. If it is granted the authority, the applicant can compete for the shipper's business by offering better service." The new winner, Wells Fargo, moved to dismiss its pending lawsuit in this court without prejudice and the motion was granted. The new loser, Brink's, filed the instant petition for review.[5] Before oral argument the Commission, acting through Division 2, approved a permanent authority permit for Wells Fargo as a motor contract carrier, and on August 24, 1979 (after oral argument) Division 2 denied Brink's petition for administrative review and affirmed the earlier grant to Wells Fargo of permanent authority. These actions raise a shadow of mootness over the grant of temporary authority. Determining first that the subsequent administrative action does not render this case moot, we next examine the validity of considering a shipper's economic and competitive needs under the temporary authority statute.

## II

## MOOTNESS

Before oral argument counsel for the Commission suggested that the subsequent grant of permanent authority mooted this case. However, at argument counsel informed us that the permanent authority decision of Division 2 had been appealed administratively. It appeared that, until final agency action[6] had occurred, the grant of temporary authority was still outstanding; Commission counsel conceded that until the further administrative appeal was resolved this case would not be moot. But, as noted above, on August 24, 1979, the final step was taken and permanent authority was definitively granted by the Commission.

■ We conclude, nevertheless, that the grant of temporary authority is not moot and may still be reviewed by this court on its merits. We take this position because the award of temporary authority falls within the category of "short term orders, capable of repetition, yet evading review." *Southern Pacific Terminal Co. v. I. C. C.,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed.

---

2. The Bank stated that it would save a total of $1.2 million by using Wells Fargo on both the North Carolina and West Virginia routes. After preliminary Commission denial of the application, the Bank gave Brink's a new three-year contract for North Carolina. However, the West Virginia runs, which remain at issue here, were covered only by short term (six month) contracts (with a 90-day cancellation clause) on which the Bank could still save some $900,000 if Wells Fargo was given temporary authority.

3. The Bank said that Wells Fargo submitted the "best service proposal" and claimed that Wells Fargo's service would provide additional flexibility. However the primary reason for Bank support was the saving that could be realized.

4. Initially the Commission declined to reconsider its decision, apparently believing that, since the January 1978 contract deadline had passed, the Bank was stuck with Brink's for another three years. The Bank then informed the Commission that the West Virginia contract had a six-month term with a 90 day termination provision. As noted *supra,* the Bank argued that granting Wells Fargo temporary authority would still result in up to $900,000 in savings.

5. Brink's also filed for a stay of the temporary authority order before the Commission and this court. The motions to stay were both denied.

6. *See* 5 U.S.C. § 704 (1976) (defining finality for purpose of judicial review).

310 (1911). *See also Moore v. Ogilvie*, 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969); *Tennessee Gas Pipeline Co. v. Federal Power Comm'n*, 197 U.S.App.D.C. 1 at 7, 606 F.2d 1373 at 1379 (1979); *Nader v. Volpe*, 154 U.S.App.D.C. 332, 333, 475 F.2d 916, 917 (D.C.Cir. 1973); *Alton & So. Ry. Co. v. Int'l Ass'n of Mach. & A. W.*, 150 U.S.App.D.C. 36, 41–44, 463 F.2d 872, 877–880 (D.C.Cir. 1972); *Jeannette Rankin Brigade v. Chief of Capitol Police*, 137 U.S. App.D.C. 155, 157, 421 F.2d 1090, 1092 (D.C. Cir. 1969). The Commission has by no means withdrawn from the general view of its temporary authority which is embodied in the order now challenged, and there is therefore a high probability that it will continue in that view in the future, but that, as here, judicial scrutiny will not be completed due to the time the appellate process necessarily takes. In the circumstances, consideration of the merits of this case is appropriate at this time, rather than a dismissal for mootness which would leave both the Commission and the motor carriers subject to the distinct possibility that they would never learn from the courts the parameters of the agency's temporary authority in the not unusual situation presented in this case.

## III

### TEMPORARY AUTHORITY BASED ON COMPETITIVE NEED

The only issue presented by petitioner Brink's is whether the Commission could properly consider, in awarding the temporary authority, the Richmond Bank's need for increased competition on the bidding for the West Virginia routes involved here. Petitioner's position is that such a competitive need has no place whatever in a grant of temporary authority, no matter what role it may play when a permanent award is being made. There are substantial arguments on both sides, and the margin is

close, but we have concluded that in this instance the Commission did act within its authority.

We consider the problem in the light of the situation facing the Richmond Reserve Bank when it supported Wells Fargo's application for temporary authority. In view of the considerable difference between the bids of Wells Fargo and of petitioner Brink's for the West Virginia routes, the Bank would save some $900,000 over the normal 3-year period of those contracts if awarded for the full term to Wells Fargo. *See* Part I, *supra*. In the hope that authority could be awarded Wells Fargo sooner than the end of the three-year span, the contract actually given to Brink's was for six months (with a 90-day cancellation clause). Full processing of applications for permanent authority can take upwards of two years. It is plain that, the sooner the Richmond Bank could use Wells Fargo, the sooner it would begin to save money. And the savings would not be minor or marginal, but a very substantial differential. Even a grant of temporary authority for the normal limit of 180 days (with the possibility of a special extension) would result in important savings.

Section 210a of the Motor Carrier Act (set out in note 1, *supra*) allows temporary authority grants for areas having "no motor carrier . . . capable of meeting the immediate needs of the place or area." [7] A long-standing judicial gloss on the statute has it that the mere existence of other carriers physically capable of driving trucks in an area does not preclude a grant of temporary authority. Rather, the shipper's need for, *e. g.* direct-line service, national connections, or special equipment and timetables, has provided the basis for an "immediate need," even where other carriers were in the area. *See, e. g., Union Cartage Co. v. United States*, 244 F.Supp. 1005 (D.Mass. 1965) (3-judge court) (affirming temporary authority based on shipper's letter that ex-

---

7. Section 210a as originally enacted and codified before the 1978 recodification required an "immediate and urgent need." Pub.L. No. 777, ch. 811, § 10, 52 Stat. 1236, 1238 (1938) *as previously codified in* 49 U.S.C. § 310a (1976).

The 1978 recodification expressly provides that it was not intended to revise the substantive meaning of any provision, and we use the "immediate need" phrasing for convenience.

isting motor carriers proved inadequate); *Roadway Express, Inc. v. United States*, 263 F.Supp. 154 (N.D.Ohio 1966) (3-judge court) (shipper's need not satisfied by existing interlining carriers; temporary authority for single line carrier affirmed); *Estes Express Lines v. United States*, 292 F.Supp. 842 (E.D.Va.1968) (3-judge court) (shipper's need for nationwide, connected service supports temporary authority; existence of local interlining carriers not sufficient), *aff'd per curiam*, 394 U.S. 718, 89 S.Ct. 1469, 22 L.Ed.2d 673 (1969); *Superior Trucking Co. v. United States*, 302 F.Supp. 257 (N.D. Ga.1969) (3-judge court) (shipper's statements that existing carriers lacked necessary equipment, were remotely located, and failed to answer service calls supported finding of "immediate need") *Bell Lines, Inc. v. United States*, 306 F.Supp. 209 (S.D. W.Va.1969) (3-judge court) (shipper's letters that existing carriers were inadequate supported finding of need), *aff'd per curiam*, 397 U.S. 818, 90 S.Ct. 1517, 25 L.Ed.2d 804 (1970). *Cf. American Farm Lines v. Black Ball Freight Service*, 397 U.S. 532, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970) (affirming on procedural issues Commission finding of need for additional single-line service when number of adequate existing carriers was too small to meet shipper's requirements). This long-standing judicial construction is congruent with the construction of the "public necessity and convenience" requirement for permanent common carriers. Although the "public necessity" standard is different from the "immediate need" standard applicable here, courts applying that language have also concluded that the mere existence of a physically able carrier does not negate a finding of necessity. *See Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 286–89, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *Nashua Motor Express, Inc. v. United States*, 230 F.Supp. 646, 653 (D.N.H.1964) (3-judge court) (and cases cited).

■ These holdings do not, of course, control the present issue of whether a shipper's competitive need can be found an "immediate need" in the sense of the temporary authority statute, but the rulings do show that a temporary grant is not excluded simply because the shipper can somehow have its goods moved physically from one point to the other.

On its face the temporary authority statute specifies only that the need be "immediate" and that there be no other motor carrier capable of meeting that particular need. What types of "immediate need" there can be is left undescribed by the legislation. We know from previous decisions, summarized above, that the requisite need does not have to be a physical need for transportation—that a need for a particular type of service can be sufficient. Is that the full extent of the authority? The text of the statute does not give a definitive answer, leaving open the content of "immediate need."

Although the legislative history of the provision indicates that Congress was thinking in terms of physical and perhaps service-type needs, the ultimate emphasis seems to have been on the emergency or exigent nature of the need (*i. e.* the need for quick availability to the shipper of a carrier, without waiting for a grant of permanent authority) and there is nothing in the history forbidding consideration of competitive needs if they should prove in a particular instance to be of that compelling character. In 1938 Congress approved a series of clarifying and procedural amendments to facilitate administration of the 1935 Motor Carrier Act. Among the changes was the temporary authority provision, designed to give the ICC power to bypass normal procedural requirements and quickly grant temporary service in case of immediate and urgent need. The committee reports simply declare that such authority would be limited to "situations in which there was an emergency and where the points or territory affected were without carrier service capable of meeting the need." H.Rep. No. 2714, 75th Cong., 3d Sess. 3 (1938); S.Rep. No. 1650, 75th Cong., 3d Sess. 2 (1938) (containing identical language). This emphasis on emergencies is reflected in the hearings where then Chairman Eastman of the ICC stressed that

emergency authority would be narrowly restricted and applied to protect the "legitimate interests of other carriers." *Subcommittee of the Senate Committee on Interstate Commerce, To Amend the Motor Carrier Act, 1935,* 75th Cong., 3d Sess. 5, 20 (1938) (Senate Hearings); *Subcommittee of the House Committee on Interstate and Foreign Commerce, Amending the Motor Carrier Act* 11–12 (1938) (House Hearings). The only type of emergencies mentioned to the Committees were actual physical needs, *see* Chairman Eastman, *Senate Hearings, supra,* at 5, *House Hearings, supra,* at 11 ("The bringing in of oil wells in a new field and conditions created by a flood or other calamitous visitation are good examples, and there are others.")[8] But the full metes and bounds of the general terms of the provision were not spelled out, and the Commission was left with flexible authority within a limited range. The real thrust of the committee reports and the hearings was that temporary authority was to be limited to cases of an unmet need of sufficient exigency that the normal hearing procedures for a permanent authority grant should be pretermitted. *See Senate Hearings, supra,* at 5, 20 (statement of Chairman Eastman).

On this basis, we do not read the text of the statute or its legislative history as necessarily excluding a competitive need if the Commission can legitimately find that that unmet need is of sufficient exigency and gravity to call for immediate action, rather than awaiting permanent authority. A competitive need is undoubtedly a "need" within statutory coverage. In *International Detective (Wells Fargo), supra,* decided today, we hold that a competitive need can be a "distinct need" for permanent contract carrier authority. There is no reason why a competitive need cannot similarly be a "need" for temporary authority—provided that it meets the additional requirements of immediacy and exigency. The National Transportation Policy (now section 10101), which blankets all motor carrier regulations including the temporary authority provisions, reflects congressional concern for economic considerations in transportation.[9] Subsection (a)(2) establishes a general policy of "safe, adequate, *economical,* and efficient transportation" (emphasis added), and subsection (a)(4) speaks of a policy of "reasonable rates." If competitive considerations reach the exigent and compelling plane, they furnish an "immediate and urgent need" within the scope of the provisions for temporary authority. In our view, the Congresses which initiated and continued that provision for a temporary grant would not have balked at such a construction.

8. *See, also, Senate Hearings, supra,* at 189 (statement of Ivan Bowen, representing National Association of Motor Buses); *House Hearings, supra,* at 120 (statement of J. Ninian Beall, representing American Trucking Association); *id.* at 148 (statement of J. M. Souby, representing Association of American Railroads).

Insofar as later decisions have applied the temporary provision to service rather than physical needs (see the cases cited *supra*), those rulings go beyond the specific examples cited at the congressional hearings.

9. Section 10101 reads as follows:
§ 10101. Transportation policy
(a) To ensure the development, coordination, and preservation of a transportation system that meets the transportation needs of the United States, including the United States Postal Service and national defense, it is the policy of the United States Government to provide for the impartial regulation of the modes of transportation subject to this subtitle, and in regulating those modes—

(1) to recognize and preserve the inherent advantage of each mode of transportation;

(2) to promote safe, adequate, economical, and efficient transportation;

(3) to encourage sound economic conditions in transportation, including sound economic conditions among carriers;

(4) to encourage the establishment and maintenance of reasonable rates for transportation without unreasonable discrimination or unfair or destructive competitive practices;

(5) to cooperate with each State and the officials of each State on transportation matters; and

(6) to encourage fair wages and working conditions in the transportation industry.

(b) This subtitle shall be administered and enforced to carry out the policy of this section.

We are reinforced in our belief—that account can be taken in a temporary grant of an impelling competitive need—by the Commission's regulations on temporary authority which have been in effect since 1965. These regulations distinguish between two types of temporary authority: "emergency temporary authority" for 30-day periods to meet those very insistent emergencies where time does not permit even normal temporary authority procedures; and "regular" temporary authority for the statutory 180-day period which incorporates certain filing requirements with provision for *Federal Register* notice and opportunity to file a protest. 49 C.F.R. § 1131.1(b)(1) (1978) (defining "temporary authority" and "emergency temporary authority"); *see id.* at § 1131.2, § 1131.3 (procedural requirements for filing "temporary authority" applications).[10] Thus, the initial congressional concern for authorizations without any formal procedural requirements when there occurred "calamitous visitations" has been confined to the more limited "emergency temporary authority" cases. *See* 49 C.F.R. § 1131.4(b)(3) (1978) (describing "emergency" authority as necessary to meet, *inter alia*, "needs resulting from fires, floods, storms, or other disasters which affect the public health"). Broader types of needs are now covered under the "regular" temporary authority provisions, which correspondingly provide more elaborate procedural protections. Section 1131.-4(b)(2) describes the "regular" temporary authority provision in examples of:

> a new or relocated plant, different method of distribution, new or unusual commodities, an origin or destination not presently served by carriers, a discontinuance of existing service, failure of existing carriers to provide service, *or comparable situations which require new motor carrier service before an application for permanent authority can be filed and processed.* (emphasis added).

This broader administrative category includes a wide range of shipper needs; we see no reason why exigent economic needs should not be among them.

It is also significant that, in another context of weighing shippers' needs, the ICC has a long-standing record of recognizing economic needs as relevant to the need for new carriers or new routes. In evaluating common carrier applications (for permanent operation) the Commission is required to consider "public convenience and necessity." 49 U.S.C. § 10922(a)(2) (1979). In determining "public necessity" the Commission has long recognized the shipper's need for reasonable rates under the "economic embargo" doctrine. Although mere desire by a shipper for more desirable rates will not demonstrate public necessity, a showing that existing carrier rates are "too high or structurally ill-suited to move traffic" will justify certification of a new carrier. *See, e. g., Armellini Express Lines, Inc., Ext-Freight Forwarder Traffic*, 113 M.C.C. 603, 614 (1971), aff'd sub nom., *Alterman Transport Lines, Inc. v. United States*, 361 F.Supp. 664 (M.D.Fla.1973) (3-judge court); *Kroblin Refrigerated Xpress, Inc., Ext.-Freight Forwarder Traffic*, 123 M.C.C. 831, 841 (1975), aff'd sub nom., *Regular Common Carriers Conference v. I. C. C.*, 182 U.S.App. D.C. 177, 559 F.2d 798, cert. denied, 434 U.S. 903, 98 S.Ct. 299, 54 L.Ed.2d 190 (1977); *National Freight, Inc., Ext.-Pittsburgh, Pa.*, 110 M.C.C. 433 (1969); *United Parcel Service, Inc.—Common Carrier Application*, 68 M.C.C. 199 (1956); *Herman R. Ewell Ext.-Philadelphia*, 72 M.C.C. 645 (1957). While petitioner Brink's rates here are not a complete embargo in the classic sense, the $900,000 in rate savings to the shipper Bank (over a three-year period) is certainly a powerful economic consideration. The Commission has previously recognized the economic ills produced by a monopolist carrier, *see, e. g., Frank R. Chullino, Extension-Alcoholic Beverages and related items to Omaha*, 120 M.C.C. 181, 189 (1973); *George D. Best & Harold Wilcox-Common Carrier Application*, 120 M.C.C. 551 (1974); *Samuel J. Lansberry, Inc., Ext.-Centre County, Pa.*, 126 M.C.C. 456, 458–59 (1977),

---

**10.** This interpretation of temporary authority has been in effect since 1965, when regulations on temporary authority applications were first published. *See* 30 Fed.Reg. 5836 (1965).

and has well-recognized discretion to consider competition in determining "public necessity." *See, e. g., Bowman Transportation, supra,* 419 U.S. at 288, 297–99, 95 S.Ct. 438; *International Detective (Wells Fargo), supra.* We do not incorporate the common carrier content of "public necessity" into the "immediate need" standard of temporary authority for contract carriers. We think, rather, that one element of necessity in common carrier application—severe economic need—provides a useful analogy in considering the types of need in temporary authority cases.

Though the issue does not appear to have been presented often or definitively, there is also some case authority supporting the use of competitive or economic considerations in temporary authority cases. *See East Coast Transportation Co. v. United States,* 556 F.2d 741 (5th Cir. 1977) (per curiam); *Central Delivery Service of Washington, Inc.,* Doc. No. MC 140443 (Sub. No. 2–TA) (Feb. 11, 1977);[11] *cf. Alterman Transport Lines, Inc. v. United States,* 361 F.Supp. 664, 669 (M.D.Fla.1973) (3-judge court) (noting emergency temporary authority and temporary authority granted to

carrier on basis of economic embargo theory). We know of no case authority to the contrary.

Our general conclusion—from the statutory text, taken together with the legislative and administrative history—is that the Commission can legally take account of a competitive need where that factor creates for the shipper an exigent, immediate need for the applicant's service in order to gain or save a substantial sum.[12] In the specific case before us, we hold that the Commission did not act arbitrarily or abuse its discretion in finding those conditions to exist. The agency could permissibly determine that the Richmond Bank fell into that category because of the sharp difference between petitioner's and Wells Fargo's bids, and the magnitude of the sum at stake.[13]

*Affirmed.*

---

**11.** Like most of the Commission's temporary authority decisions, this is an unpublished order. The facts in *Central Delivery* provide an exact parallel with this case: temporary authority was granted to an armored carrier to serve the needs of the Baltimore branch of the Federal Reserve Bank. The Bank stated in supporting shipper that temporary authority would save it a very substantial sum, some $255,000 per annum, while the permanent authority application was still pending. In a summary order the Commission (on reconsideration) granted the temporary authority.

**12.** In reaching this conclusion, we do not forget the possibility that an existing carrier with a monopoly (by virtue of having the sole ICC authority) over Federal Reserve or other business may prolong and delay permanent authority proceedings for quite a while, and thereby continue to reap its monopoly profits until the new entrant is finally approved. We do not suggest that petitioner was guilty of such delaying tactics. But in *Central Delivery Service of Washington, Inc.,* Doc. No. 140443 (Sub. No. 2–TA) (Feb. 11, 1977), *supra,* note 11, the Baltimore Bank branch expressed considerable concern over the delaying tactics of the protesting (and sole authorized) carrier on a pending permanent authority grant.

**13.** Though petitioner's sole attack is that consideration of economic issues was outside the statutory boundaries, it does make a subsidiary argument that the Bank's need was not "immediate" but rather "prospective," based on the fact that even after temporary authority was granted it would take the Bank 90 days to terminate the existing contract with Brink's. This argument is without merit because the "immediate need" does not require an instantaneous need. The temporary authority regulation allows for needs arising anytime "before an application for permanent authority can be filed and processed"—a period often involving several years. 49 C.F.R. § 1131.4(b)(2) (1978). The regulation also defines immediate need as a showing that "there is *or soon will be* an immediate transportation need" (emphasis added). *Id.* Brink's construction would compel a shipper to await until the first day of actual need arose before filing for temporary authority, causing the shipper to go without needed services during the processing period. Further, in this case the Bank's need was "immediate" in the sense that as soon as a new carrier was authorized the Bank could give Brink's the requisite notice and thereby minimize the Bank's transportation costs.